WALTER KOWALCZYK, administrator, *vs.* EDWARD T. MURPHY.

WALTER KOWALCZYK *vs.* SAME.

Middlesex.　　October 7, 1936. — October 28, 1936.

Present: RUGG, C.J., CROSBY, PIERCE, FIELD, & LUMMUS, JJ.

*Agency,* Scope of authority.

An employer could not properly be found liable for conscious suffering and death of one who fell into a vat of mash while performing duties of an employee at the employee's request and for his convenience where there was no evidence that the employee had express or implied authority to make such a request.

TWO ACTIONS OF TORT. Writs in the Superior Court dated January 14, 1935.

The actions were tried together before *Donnelly*, J., who ordered verdicts for the defendant. The plaintiffs alleged exceptions.

*H. T. Broderick*, for the plaintiffs.

*S. Burr*, (*C. S. Wing* with him,) for the defendant.

CROSBY, J. These are actions of tort. In the first case the plaintiff as administrator of the estate of his eighteen year old son seeks to recover in separate counts for his conscious suffering and death, due to falling into a tank or vat of scalding mash. Both counts are based on the alleged negligence of the defendant in failing to provide the plaintiff's intestate with suitable equipment and a safe place in which he might perform the work he was engaged in on premises under the control of the defendant; and also, upon the failure of the defendant to instruct and warn the intestate of danger arising out of unsafe conditions permitted by the defendant to exist on said premises. The other action is brought by the plaintiff as father of the intestate, a minor, to recover for medical expenses and loss of services.

The cases were tried together before a judge of the Superior Court and a jury. There was evidence from which the jury could have found the following facts: During the years 1933 and 1934 the Clinton Distilleries Corporation was engaged in the manufacture of whiskey in Clinton, in this Commonwealth. In the process a by-product was created called wet brewery grain or mash. This by-product was about fifteen per cent solid matter, consisting of distilled grain or corn, and about eighty-five per cent liquid. The liquid was principally water. The mash was a suitable article of food for cattle and was sold to farmers, and before April 12, 1934, it had been sold to them by the Clinton Distilleries Corporation. The defendant was in the business of buying and selling by-products of this nature. On April 12, 1934, he entered into a contract with the distilleries corporation for the purchase of all the mash to be produced at the distillery for a term of five years from that date. The contract provided that the defendant would promptly load and remove the mash at his own expense

from the premises of the distillery and would furnish all necessary trucks, help and other equipment, and would promptly remove all wet grains from the distillery as rapidly as they should become available; that the defendant would pay the distillery on the first of each week during the term of the contract for all wet brewery grains delivered to him; and that the defendant should have access to the distillery premises so far as necessary to remove the wet brewery grains, upon certain specified conditions.

The whiskey was distilled inside the building and the mash ran through a pipe from each still to two vats, shaped like large tubs, outside the building. These vats were about seven feet high and fourteen feet across, were constructed of wood two inches thick, were open at the top, and were set upon a platform eight feet above the surface of the ground, the platform being supported by metal posts upon a concrete foundation. A wooden ladder extended from the floor of the platform to the top of each vat, and was fastened to the platform about a foot from the bottom of the vat. The height of the platform permitted trucks to back in under pipes connected with the vats, and load the mash. The platform, vats, pipes and ladders above referred to were the property of the distilleries corporation, and had been used by it before April 12, 1934, the date of the contract. During the entire period between that date and the time of the accident, there were two wooden, circular covers in a building near the platform, which were owned by the distilleries corporation. The defendant knew that these covers were there and that they were designed for use in covering the vats. At no time did he use them or ask permission to do so. The plaintiff's intestate had no knowledge of their existence. If the mash was left standing in the vats the solid matter tended to settle to the bottom. In the event of such settling there would be very little solid matter in the liquid coming from the pipes to the purchaser's containers. To avoid this it was the practice to keep stirring the mash from above the vats with a stick or other implement while it was being loaded into trucks.

From the time of the making of the contract with the defendant until the day of the accident several farmers in the vicinity purchased mash from the defendant at a price which gave him a reasonable profit. One of these farmers was the father of the intestate and the son assisted in the loading of his father's truck. They came on an average of twice a week between April 12 and June 2, and on such occasions the premises, vats and other equipment were substantially in the same condition as they were in on the day of the accident.

During the entire period in question the defendant had in his employ one Booker whose duty it was to conduct the business of selling and delivering mash to customers and do whatever was reasonably necessary to that end, and to receive payment for mash sold and give receipts therefor. The defendant visited the premises on an average of once a week. On many occasions each day Booker went up the ladder on the side of the vat, and while standing on a plank across the top of the vat stirred the mash with a metal implement, and the customer attended to the flow of mash into the container on the truck. The board across the top of the vat was about fourteen feet long, eight inches wide, and two inches thick. It was not fastened at either end. Booker knew these facts, but the plaintiff's intestate did not know them. This plank was in the same position across the top of the vat from April 12, 1934, to June 2, 1934, and it had been there before April 12, 1934.

On June 2, 1934, about 4:30 P.M. the plaintiff and the intestate went to the vats with a truck to buy mash from the defendant. Booker was on the platform when they arrived. He told them it was getting late and he wanted to get started for his home which was about sixty miles from there. He said to the plaintiff's intestate, "get up there and stir your mash." He gave him no instructions or warning of danger or any information that the plank was not fastened. The plaintiff's intestate climbed up a ladder leading from the ground to the platform and was handed a hoelike implement by Booker which he commonly used to stir the mash. The intestate took it and

ascended the ladder up the side of one of the vats. One end of the plank extended across the top of the vat in such a position that one could step from the top of the ladder onto the plank. The intestate stepped from the top of the ladder to the plank, and when he was out near the middle he started stirring the mash with the hoelike implement above referred to. A few days previously he had done the same thing under similar circumstances. While he was using the implement in stirring the mash the plank slid or skidded and he fell forward into the vat. The mash was "scalding hot" and he sustained injuries from which he suffered consciously and later died.

There was evidence that the father incurred obligations for hospital and medical services for the intestate subsequent to the time of the accident.

At the close of the evidence the defendant moved for a directed verdict in his favor in both cases. The motions were granted subject to the plaintiff's exceptions.

The defendant's employee Booker, who was in charge of selling the mash at the time, told the plaintiff's intestate to "get up there and stir your mash" because it was late and Booker wanted to leave for home. There was no evidence to warrant a finding that he had any authority from the defendant to direct the intestate to go upon the plank and stir the mash. It was Booker's duty to stir the mash. There was evidence of only one previous occasion when he had not done so. A finding would not have been warranted that the defendant had knowledge that Booker had ever permitted any customer to go upon the plank, or that any customer had previously stirred the mash. The purpose of Booker in allowing the intestate to go upon the plank was that he might leave for home at an earlier time than he would have been able to leave if he had performed his duty. His order to the intestate to stir the mash was for his own convenience, and not for the purpose of furthering the interests of his employer. There was no evidence which would warrant a finding that Booker had any authority express or implied to ask or permit the plaintiff's intestate to go upon the plank or to assist in any way in the loading of the truck with mash from the vat. *Butler* v. *Me-*

*chanics Iron Foundry Co.* 259 Mass. 560. *Murphy* v. *Barry,* 264 Mass. 557, 559. *Broitman* v. *Silver,* 270 Mass. 24. *Coulombe* v. *Horne Coal Co.* 275 Mass. 226.

As the evidence would not have warranted findings in favor of the plaintiff, the trial judge rightly directed a verdict for the defendant in each case.

*Exceptions overruled.*